**George E. SAFELY et al., Plaintiffs,**

**v.**

**TIME FREIGHT, INC., et al., Defendants.**

**Civ. A. No. 68–C–19–H.**

United States District Court
W. D. Virginia,
Harrisonburg Division.

Oct. 21, 1969.

Flournoy L. Largent, Jr., Largent, Anderson & Larrick, Winchester, Va., for plaintiffs.

Robert C. Moss, Richmond, Va., for defendant Time Freight, Inc.

Donald M. Murtha, and Herbert S. Thatcher, Washington, D. C., for defendant, Local Union, etc.

## OPINION and JUDGMENT

DALTON, Chief Judge.

This suit was commenced under Section 301(a) of the Labor Management Relations Act, 61 Stat. 156, 29 U.S.C. § 185(a) (1947). The plaintiffs are some thirty-three employees of Time Freight, Inc. (hereafter referred to as "Time"). The defendants are Time, the International Brotherhood of Teamsters, Chaufeurs, Warehousemen and Helpers of America (hereafter referred to as "IBT"), and Local Union No. 539, affiliated with IBT and to which the plaintiffs belong. The plaintiffs allege a vio-

lation of the collective bargaining agreement, the National Master Freight Agreement (hereafter referred to as "the National Agreement"). The National Agreement is a nationwide agreement to which not only Time, but also numerous other over-the-road truckers throughout the United States, are parties and to which not only Local 539, but numerous other local unions affiliated with IBT are parties. The National Agreement covers most of the major trucking employers in the United States, and establishes wages, hours, and working conditions, including seniority rights for all employees employed by employers who are parties to the agreement. Time is a large over-the-road trucking company operating across the United States.

The facts are not in dispute. Late in 1967, Time found it necessary to change its then method of operations when, among other things, it sought to close its Bristol, Tennessee terminal, eliminate 19 employees in its Nashville terminal, and to transfer these displaced employees from these to other terminals, principally to Winchester, Virginia. Under the National Agreement, Article 8, (e), any employer covered by the Agreement is not permitted to close or change a terminal or otherwise change its operations without "having asked for and received approval from an appropriate committee on change of operations."

Accordingly, late in December, 1967, Time did request such approval from the Joint Area Change of Operation Committee. This committee consists of an equal number of employer and union representatives selected from the geographic area of the conference which is affected by the proposed change of operations, in this case the Eastern and Southern Conferences of IBT. The committee met and heard Time's proposals and by a decision dated January 4, 1968, approved certain changes of operations. Under this decision employees who transferred from Bristol to Winchester were dovetailed into the Winchester seniority lists. If less than 70 employees requested transfer to Winchester, the Company was to offer the right to transfer to Winchester to any employee in the Southeastern Area who is laid off as a result of being bumped by modified seniority caused by this change. Employees thus affected were to be offered the right to transfer one time and the offer must have been made within 60 days from the effective date of the change. Employees offered the right to transfer to Winchester would go to the bottom of the board for work opportunities, but with full Company seniority for fringe benefits.

This January 4th decision was approved by representatives of Local 539 and Winchester representatives of the Company on May 23, 1968, when it was also agreed between those parties, consistent with the January 4th decision, that employees coming into Winchester after May 21 would go to the bottom of the seniority list and would not be dovetailed. By that time, only 41 of the 70 displaced Bristol employees had transferred to Winchester and had been dovetailed without objection. Later on, the remaining 29 Bristol employees transferred to other Time terminals located in the southeastern states including Knoxville, Atlanta, and Nashville, where they were dovetailed and where they, in turn, displaced or bumped employees in those terminals.

The difficulties which eventually resulted in the present litigation arose when a temporary injunction was issued in Nashville which was later dissolved, but while it was in effect prevented Bristol employees and other displaced employees from coming into Nashville. This upset the cycle of transfer originally contemplated by the January 4th decision. To review the situation, the Joint Area Change of Operations Committee was again convened on June 26, 1968. Representatives of all of the affected locals were invited, including Local 539.

The Committee modified the January 4th decision by permitting dovetailing of the bumped employees from the southeastern states who applied to Winchester for one of the remaining 29 positions,

provided that they apply by September 1, 1968. These positions were filled.

Plaintiffs are those employees at Winchester who were affected by the dovetailing of these 29 positions. The plaintiffs contend that the June 26th decision was made in violation of the National Agreement.

Congress established by § 301[1] that the district courts could entertain suits for violation of collective bargaining agreements. This section was enacted for a number of reasons. Collective bargaining agreements are not enforceable by and against unions. Congress was interested in promoting collective bargaining that ended with agreements not to strike. It was hoped that by providing the parties to an honest dispute over a contract interpretation with a peaceful alternative to economic disruption, industrial conflict could be avoided. The court in Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 455, 77 S.Ct. 912, 917, 1 L.Ed.2d 972, 979 (1957), said, "Plainly the agreement to arbitrate grievance disputes is the *quid pro quo* for an agreement not to strike."

Congress in enacting § 301 decided to leave the most important determinations open for judicial interpretation. § 301 is silent as to who may sue whom, how much reliance is given to grievance procedures and arbitration awards, or what law is followed in this area.

It was established in Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962), that in certain situations employees have standing to sue under § 301. Black dissenting made a noteworthy comment:

But it seems to me that the Court studiously refrains from saying when, for what kinds of breach, or under what circumstances an individual employee can bring a § 301 action and when he must step aside for the union to prosecute his claim. 371 U.S. at 204, 83 S.Ct. at 272, 9 L.Ed.2d at 253.

The courts have generally recognized the standing of the individual employee to bring suit, but have imposed other limitations on the right to hear his grievances. The famous Steelworkers' trilogy[2] established the function of the courts in suits involving collective bargaining agreements calling for arbitration. The court in United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424, 1429 (1960), stated:

[A] plenary review by a court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final. This underlines the fundamental error which we have alluded to in United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343 [4 L.

---

1. § 301 of the Labor Management Relations Act reads in part:

   (a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

   (b) Any labor organization which represents employees in an industry affecting commerce as defined in this chapter and any employer whose activities affect commerce as defined in this chapter shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets.

2. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343 & 1363, 4 L.Ed.2d 1403 & 1432 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

Ed.2d 1403]. As we there emphasized, the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed. 2d 1409, 1417 (1960), held that the court's inquiry under § 301 is "strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made." The philosophy[3] behind the Steelworkers' trilogy was later enacted into law. § 203(d) of the Taft-Hartley Act, 29 U.S.C. § 173(d) (1964), states:

Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement.

The same approach has been taken to open-end grievance procedures (those not culminating in arbitration) with final determination clauses. Haynes v. United States Pipe & Foundry Company, 362 F.2d 414 (5th Cir.1966); See also,

General Drivers, etc., Local U. No. 89 v. Riss & Co., 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963). Under these procedures the grievance is considered by a body or person other than an arbitrator and the determination thus reached is declared to be "final and binding." Haynes v. United States Pipe and Foundry Company, supra, involved this type of collective bargaining agreement. The court held that when the grievance procedure became a final determination under the collective bargaining agreement, the court would not be a forum for review of the merits of the grievance. The court stated that, "The doors of the court were open but the claim was barred." 362 F.2d at 418.

There are certain exceptions to the refusal of the courts to hear the merits of "final" arbitration and grievance procedure awards. One major exception is recognized where the union as bargaining agent breaches its duty of fair representation in its handling of the employee's grievance. Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). It should be noted the plaintiffs are not contending that the union breached its duty of fair representation. Another exception is recognized when the grievance procedure is inadequate or unavailable. See Rothlein v. Armour & Company, Inc., 391 F.2d 574 (3rd Cir.1968). A third type of escape from the finality of the procedure was

3. This philosophy is best explained by the following statement in United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581 & 582, 80 S.Ct. 1347, 1352 & 1353, 4 L.Ed.2d 1409, 1417 (1960):

The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria

for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed.

recognized in Bieski v. Eastern Automobile Forwarding Company, 396 F.2d 32 (3rd Cir.1968). The court there stated:

> If, however, the private decision complained of is a 'jurisdictional' one —that a certain dispute will not be considered on its merits by the private decision-maker—then the court is a proper forum to review this decision on the basis of its analysis of the contract entered into by the parties. John Wiley & Sons v. Livingston, 376 U.S. 543, 546–547, 84 S.Ct. 909, 11 L. Ed.2d 898 (1964). This is particularly true where the court is convinced that a private procedure used for the determination is not adequate to decide fairly and fully such an important initial question. Rothlein v. Armour & Company, Inc., supra. 396 F.2d at 38.

The court found that the opinion of the Joint Committee upon the consideration of the term "absorption" was a jurisdictional decision.[4]

■ The court now comes to a consideration of the facts of this case. Under the National Agreement, grievances of individual employees in a particular area are handled pursuant to the provisions of Article 42 thereof. As set forth in the Article, such grievances are heard by a "Virginia State Committee" consisting of an equal number of disinterested representatives of union and employers covered by the contract in the State of Virginia, but none from the local unions involved. This Virginia Committee, which has jurisdiction of grievances, is to be distinguished from the Joint Area Change of Operation Committee which has jurisdiction over any proposed change of operation, including any seniority problems thereby involved. Specific grievances, such as the present one, which might arise when a Change of Operation Committee decision was put into effect, would be handled by the Virginia State Committee. The Virginia State Committee, finally, met and dismissed the grievances on January 22, 1969, by a unanimous decision. By Article 43, Section 1(a) of the National Agreement, any State Committee decision reached by a majority vote is "final and binding on both parties." This section has the initial effect of making this case "ripe" under § 301. Before § 301 suits may be maintained in the courts, the available grievance machinery must be exhausted. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).

This section secondarily raises the question of whether under Haynes v. United States Pipe and Foundry Company, supra, the court may review the merits of grievance. Here the court, as there was in *Haynes*, has before it a case where arbitration is not part of the grievance procedure, but the grievance committee's award is said to be "final and binding". The court in accord with *Haynes* will refuse to examine the merits of the grievance unless some exception to the general rule is applicable.

■ The Virginia State Committee's decision to dismiss the grievance of the plaintiffs was a "jurisdictional" decision under Bieski v. Eastern Automobile Forwarding Company, supra, and justifies this court in considering the merits of

---

4. The Joint Committee was called upon to determine whether one company (Eastern) was absorbed by another (M & G). The court held:

   [T]he consideration of 'absorption' was a jurisdictional decision in the Joint Committee's opinion. In the event M & G absorbed the business of Eastern, then the Joint Committee could solve the 'merits' of a seniority dispute submitted to it under the last sentence of Article 4, Section 5. The decision that there was no absorption meant that M & G could determine seniority as it wanted with respect to the Eastern employees; it was not a seniority problem open for 'mutual agreement', the lack of which agreement could then be taken to the Joint Committee. Under federal labor law, we think that this 'jurisdictional' question is a proper one for the courts, just as it would be if the question before us were whether or not a given dispute should go to arbitration. 396 F.2d at 40 and 41.

the claim. The Virginia State Committee dismissed this case by the following decision:

> The decision in Case 462–R–68, motion made and duly seconded, voted on and carried, that this case is improperly before the Virginia State Grievance Committee due to the fact that this case has been heard and decision duly rendered by the Multi-Conference Committee [the Joint Area Change of Operations Committee]. Filing fee split.

The Virginia committee, by deciding that it did not have authority to change the Joint Area Change of Operations Committee's decision, never rendered a decision on the merits of the grievance.

Although the Change of Operations Committee did consider the merits of the grievance twice (the first on June 26, 1968 and the second on December 9, 1968), the court does not find any language in the National Agreement making its decision "final and binding". Because the grievance has never been considered on the merits by a committee whose decision is to be "final and binding", this court has no authority (by statute, case law, or federal policy) to dismiss this suit without making an inquiry into the merits of the grievance.

The court, therefore, must determine whether there was a breach of the National Agreement—assuming that under Smith v. Evening News Assn., supra, this is a proper employee suit. This case is controlled by federal law. In Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 451, 77 S.Ct. 912, 915, 1 L.Ed.2d 972, 977 (1957), the court held that § 301 was not merely jurisdictional and that "it authorizes federal courts to fashion a body of federal law for the enforcement of * * * collective bargaining agreements * * *."

The plaintiffs contend that the June 26, 1968 decision to dovetail 29 men into the Winchester seniority lists was in violation of two sections of the National Agreement.

■ First, the plaintiffs assert that Article 5, Section 5, (c) was violated by this June 26, 1968 decision. This section reads as follows:

> When a branch, terminal, division or operation is closed and the work of the branch, terminal, division or operation is eliminated, and no part of it is transferred to another branch, terminal, division or operation employees who are affected thereby shall be given first opportunity for available regular employment at any other branch, terminal, division or operation of the Employer within the Area of the Supplemental Agreement under which employed. The obligation to offer such employment shall continue for a period of three years from the date of closing, however the Employer shall not be required to make more than one offer during this period. Any employee accepting such offer shall pay his own moving expenses. If hired, they shall go to the bottom of the seniority board but shall have company seniority for fringe benefits only.

What the plaintiffs have chosen to ignore is Section 7 under the same Article 5. This section describes two methods under which seniority rights could be changed.[5] First, by mutual agreement the Employer, the Unions involved, and the Area, Multi-Conference or National Committees could change seniority rights. Secondly, the Change of Operations Committee has the power to add to

---

5. Article 5, Section 7 states:
   The parties acknowledge that specific situations may arise which may not be covered by the rules set forth in this Article or in which the parties may feel that different treatment of the problem is necessary. In such situation, the Employer, the Unions involved, and the Area, Multi-Conference or National Committees may mutually agree to such disposition of the seniority problems as in their judgment is appropriate under the circumstances. The Change of Operations Committee under the Local Supplements or the National Master Agreement shall have the authority to add to or to modify these rules in specific situations presented to them.

or to modify seniority rights in specific situations presented to it.

The second method is the exact one employed in this situation. The Change of Operations Committee did modify Article 5, Section 5, (c), by allowing the dovetailing of seniority in the Winchester terminal. Collective bargaining agreements often provide such procedures for change because no one can predict every conceivable situation which may arise that might warrant a different rule.

Further, plaintiffs do not challenge the January 4, 1968, decision dovetailing the seniority lists. They incongruously argue that Article 5, (c), forbids one dovetailing, but not the other.

█ Plaintiffs' second contention is that Article 8, (e) of the National Agreement was violated by the June 26, 1968, decision. It is asserted that no further change of operation was asked for by the employer as required by Article 8, (e). Time did request approval for closing the Bristol terminal, eliminating 19 employees in the Nashville terminal, and the transfer of these employees to other terminals. The proper change of operations committee by a decision dated January 4, 1968, granted Time's request and laid down rules for the transfers. The Change of Operations Committee found it necessary later to change the rules regarding transfer.

Having once assumed authority over this matter, the court feels that it is only reasonable to allow the Change of Operations Committee to exercise power over these transfers until the matter is completely disposed. Once the employer has requested the Change of Operations Committee to act on a certain matter, the Committee has the authority under the contract to carry the matter to an end. The court does not find that the contract requires the employer to request each and every move by the Change of Operations Committee as long as the Committee is reasonably acting under a specific request.

For the foregoing reasons, the court finds no breach of the National Agreement and renders judgment on the merits against the plaintiffs.

The clerk is directed to send a copy of this opinion and judgment to counsel of record.