**Jim CRIGGER et al., Plaintiffs,**

v.

**ALLIED CHEMICAL CORPORATION, SEMET–SOLVAY DIVISION, a New York corporation, Defendant.**

**Civ. A. No. 73–33–BL.**

United States District Court,
S. D. West Virginia,
Bluefield Division.

Oct. 2, 1973.

in the event the Court should rule against them.

Harry G. Camper, Jr., Camper & Watson, Welch, W. Va., for plaintiffs.

R. Page Henley, Jr., John H. Tinney, Spilman, Thomas, Battle & Klostermeyer, Charleston, W. Va., for defendant.

CHRISTIE, District Judge:

Plaintiffs, members of the United Mine Workers of America, categorizing themselves as contract workers of the defendant, Allied Chemical Corporation, Semet-Solvay Division (Allied), at its Shannon Branch Mine, Capels, McDowell County, West Virginia, instituted this declaratory judgment action against Allied under 28 U.S.C. 2201, seeking a declaration of their rights to graduated vacation pay under the National Bituminous Coal Wage Agreement of 1971, which was negotiated by their International Union, United Mine Workers of America, and the Bituminous Coal Operators Association, representing bituminous coal operators, including Allied. While plaintiffs allege diversity of citizenship and requisite amount in controversy to establish federal jurisdiction under 28 U.S.C. 1332, it is clear from the pleadings and other documents in evidence that their action is also cognizable under § 301 of the Labor Management Relations Act,[1] and that this court accordingly has jurisdiction herein without regard to either the amount in controversy or the citizenship of the parties, for it was established by Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962), that in situations such as we have involved here, employees have standing to sue under § 301.

The defendant has moved (a) to dismiss for failure to state a cause of action upon which relief can be granted, and (b) for summary judgment, pursuant to the provisions of Rules 12(b)(6)

and 56, respectively, of the Federal Rules of Civil Procedure. Plaintiffs also have moved for summary judgment under Rule 56. In the Court's view, a decision on the motions for summary judgment is dispositive of all matters in issue in this case, and we accordingly now turn our attention to that motion.

## STATEMENT OF FACTS

Based upon the pleadings, affidavits, and exhibits submitted by the parties in support of their respective motions for summary judgment, the following facts are established without dispute:

The present Shannon Branch Mine was originally two mines, known as the Havaco and Capels Mines. Prior to 1961, both mines were owned and operated by the New River and Pocahontas Consolidated Coal Company. Plaintiffs are all former employees of the New River Company, having worked at either or both the Havaco and/or Capels Mine. The employees of the Havaco Mine were members of Local No. 6023 of the United Mine Workers Union, and those employed at Capels were members of Local No. 6125. In 1960, New River and Pocahontas Consolidated Coal Company ceased operations at the mines, and that company, in 1961, sold the Havaco and Capels Mines to Superior Pocahontas Coal Company. Between 1961 and 1964, Superior maintained a crew of between three and five men at the Havaco and Capels Mines for the purpose of ventilating and running pumps to prevent flooding, however, it did not engage in any mining at either location. These men were employees of Jewell Ridge Company, a company retained by Superior to maintain the condition of the mines while they were idle.

In 1964, Allied purchased the Havaco and Capels Mines from Superior. Soon thereafter Allied began engineering and

---

1. "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." Labor Management Relations Act, § 301(a), 29 U.S.C. § 185(a).

construction work at the mines for the purpose of putting them back into operation. Included as a part of the construction was the connecting of the two mines, by means of a tunnel, resulting in a single mine operation now known as the Shannon Branch Mine. Although some coal was taken out of this mine beginning in 1966, full production was not achieved until early 1968. In recruiting a work force for the Shannon Branch Mine, Allied received lists of former employees of New River and Pocahontas Consolidated Coal Company who had worked at the Havaco and Capels Mines from various officials and former officials of Local No. 6023 and Local No. 6125. Allied utilized these lists and recruited former Havaco and Capels employees and permitted such former employees to carry mine seniority dates as indicated on the lists provided.

As a consequence of the operation of Havaco and Capels as a single mining operation, Local Union No. 6023 and No. 6125 merged into a single local, Local No. 6023, which now represents all employees at the Shannon Branch Mine. Subsequent to resumption of operations in 1968, the local union raised the question of whether or not employees who had previously worked for New River and Pocahontas Consolidated Coal Company were entitled to graduated vacation pay based upon their years of service prior to being employed by Allied. The collective bargaining agreements in effect in 1968 and in 1971 provided for additional days of vacation with pay for mining employees, the number of such additional days depending upon the length of service of the employee. In its discussions concerning graduated vacation pay with Allied, the union contended that the period of previous employment by the miners with New River and Pocahontas Consolidated Coal Company, as well as the period of time during which the mines were idle, should be included. Allied took the position that the time of service with respect to the New River and Pocahontas Consolidated Coal Company employees would be properly

computed from the time these employees began work for Allied.

After having failed to reach an agreement with respect to the question of length of service and entitlement to graduated vacation pay, the issue was submitted by the union to the grievance procedure for a resolution of the dispute. The collective bargaining agreement between the United Mine Workers Union and the Bituminous Coal Operators Association provided a five step grievance procedure for the settlement of differences arising between the miners and their employers. The agreement provided that the grievance procedure was to be utilized for the settlement of disputes involving the meaning or application of the provisions of the agreement, differences arising "about matters not specifically mentioned in this agreement," or "any local trouble of any kind" arising at the mine. The steps to be followed in processing the grievance were as follows:

"(1) By the aggrieved party and his foreman who shall have authority to settle the complaint . . . . .

(2) If no agreement is reached, the grievance shall be taken up by the mine committee and the mine management within five calendar days of step 1 . . . . .

(3) If no agreement is reached, the grievance shall be taken up by the UMW District Representative and a designated representative of the Employer within ten calendar days of the conclusion of step 2 . . . . .

(4) If no agreement is reached, the grievance shall be taken up by the Board within ten calendar days of the conclusion of step 3 or in discharge cases within five calendar days of notice of appeal . . . . .

(5) Should the Board fail to agree the matter shall, within ten calendar days after decision by the Board, be referred to an umpire who shall expeditiously and without delay decide said case. The decision of the umpire shall be final . . . . ."

Pursuant to the procedures set forth in the agreement, Local No. 6023 processed the grievance of the former New River and Pocahontas Consolidated Coal Company employees through the various steps up to and including a reference to an umpire, in accordance with the provisions of step 5. A hearing was held by the umpire and evidence received bearing upon the question of the entitlement of the employees to graduated vacation pay. Subsequent to the hearing, by a written opinion, the umpire ruled that the employees were not entitled to include time previous to their employment with Allied in computing graduated vacation pay, consequently, the grievance was denied.

The 1971 Collective Bargaining Agreement entered into by the United Mine Workers Union and the Bituminous Coal Operators Association modified certain provisions, to be noted in more detail hereafter, which had been contained in the 1968 agreement under which the initial grievance had been denied. Among the changes were modifications of the provisions governing the requirements of graduated vacation pay. Asserting that this modification now required a different decision with respect to their claim for graduated vacation pay, plaintiffs, through their union, again submitted the issue to the grievance procedure and again the dispute was referred to an umpire in accordance with the provisions of step 5. After reviewing the facts, the decision rendered by the previous umpire, and the modification to the graduated pay provision contained in the 1971 agreement, this umpire also held that the employees' grievance was not meritorious and accordingly denied the grievance.

Thereafter, plaintiffs, alleging that the decision of the umpire in 1972 was "erroneous, wrong, unlawful, and in violation of their legal rights," brought the present action in this court.

## ISSUES

The threshold question which must be answered before any consideration can be given to the merits of plaintiffs' complaint is the effect, if any, that this court must give to the two previous decisions rendered by the umpires pursuant to the procedures set forth in the collective bargaining agreement, including the provision that the decision of the umpire should be "final."

## FINDINGS AND CONCLUSIONS

As first authoritatively set forth by the Supreme Court in Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, not only gave district courts jurisdiction of controversies that involve labor organizations in industries affecting commerce, but it also authorized federal courts to fashion a body of federal law for the enforcement of collective bargaining agreements between unions and management in industries affecting commerce, such substantive law to be fashioned from the policy of our national labor law. The policy of our national labor law with respect to the settlement of grievances by the parties in accordance with grievance procedures contained in collective bargaining agreements was broadly stated by Congress in Section 203(d) of the Labor Management Relations Act of 1947, 29 U.S.C. § 173(d), as follows:

> "*Final* adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement . . . ." (Emphasis added).

More particularly, with respect to the relationship of the district courts vis-a-vis the labor arbitrator or umpire and his decisions, the Supreme Court pointed out in United Steelworkers of America v. Warrior & Gulf Navigation Company, 363 U.S. 574, 581–582, 80 S.Ct. 1347, 1352–1353, 4 L.Ed.2d 1409 (1960), that,

"The labor arbitrator performs functions which are not normal to the courts; the considerations which help him fashion judgments may indeed be foreign to the competence of courts.

.    .    .    .    .    .

"The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grivance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed."

�involving Recognizing the policy of our labor laws with regard to the deference to be accorded the settlement of grievance disputes in accordance with grievance procedures provided for in collective bargaining agreements, as well as the special competence of arbitrators or umpires to comprehend and settle such disputes, the Supreme Court in the

*Steelworkers Trilogy,*[2] provided guidelines as well as certain legal principles which are to govern the courts in cases involving the question of the arbitrability of a labor dispute or the review by the court of arbitration awards rendered by arbitrators or umpires. Regarding the latter (the review of the decision of an arbitrator or umpire), the court's function is a very limited one, and where the parties, by their collective bargaining agreement, have agreed to submit differences with respect to the meaning or application of the contract to an umpire for final arbitration, as in the present case, the court is limited in its review to determining whether the issue submitted was arbitrable under the contract, Winston-Salem Printing Press & A. U. v. Piedmont Pub. Co., 393 F.2d 221, 227 (4th Cir. 1968), and whether the arbitrator, by his decision, exceeded the scope of the submission. Bricklayers, Masons, Marble and Tile Setters Protective and Benevolent Union No. 7 of Nebraska v. Lueder Construction Company, 346 F.Supp. 558, 562 (D.C. Neb.1972). It is settled law that the decision of the arbitrator under an arbitration provision in a collective bargaining agreement, which provides that the arbitrator's decision shall be final and binding on the parties, is not open to review on the merits and, under such circumstances, "the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." United Steelworkers of America v. Enterprise Wheel and Car Corporation, 363 U.S. at p. 599, 80 S.Ct. at p. 1362. While the arbitrator is confined to interpretation and application of the collective bargaining agreement

2. United Steelworkers of America v. American Manufacturing Company, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Company, supra; United Steelworkers of America v. Enterprise Wheel and Car Corporation, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

and his decision must "draw its essence" from the agreement, if in any rational way the arbitrator's interpretation can be derived from that agreement as "viewed in the light of its language, its context and any other indicia of the parties' intention," and if there is absent any evidence of fraud, deceit, or breach of the duty of fair representation or evidence that the grievance procedure was a "sham, substantially inadequate or substantially unavailable," the individual grievant is bound by an adverse decision of an umpire or arbitrator when that decision, by the terms of the agreement, is made to be "final." Safely v. Time Freight, Inc., 307 F.Supp. 319 (W.D.Va. 1969), aff'd. 424 F.2d 1367 (4th Cir. 1969); Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123 (3rd Cir. 1969); Harris v. Chemical Leaman Tank Lines, 437 F.2d 167, 171 (5th Cir. 1971); Amalgamated Butcher Workmen Local No. 641 v. Capitol Packing Co., 413 F.2d 668 (10th Cir. 1969).

On the basis of the foregoing principles, we now turn our attention to the question of whether or not the umpire's decision in this case suffers any deficiency which, under the limited review function of the courts, entitles plaintiffs to have that decision set aside. We take cognizance initially of the fact that there is absent in this case any claim or evidence of fraud, deceit or breach of the union's duty of fair representation. Nor do plaintiffs attack the grievance procedure as being a sham, substantially inadequate or substantially unavailable. Insofar as the evidence shows, the union vigorously pressed plaintiffs' grievance, utilizing all steps in the grievance procedure and pressing for a decision by an arbitrator on two separate occasions. Thus, plaintiffs rely, as indeed they must, upon their claim that the umpire's decision is contrary to the terms of the collective bargaining agreement, that it fails to "draw its essence" from that agreement, and that, accordingly, it is subject to reversal by this court. To resolve the issue raised by this assertion, it is necessary to examine in some detail the provisions of the collective bargaining agreements.

In 1969, when the first of the two decisions adverse to plaintiffs' claim was rendered, the collective bargaining agreement provided, with respect to graduated vacation pay, that,

"In addition to the foregoing vacation, any employee who has had the length of continuous employment with the coal company specified in the table below, shall be entitled to the corresponding additional vacation days each year with pay . . . . .

. . . . . .

."Continuous employment under this graduated vacation provision means employment which has not been interrupted by voluntarily quitting, discharge retirement or a final determination of permanent and total disability . . . ."

Based upon these provisions in the collective bargaining agreement, the first umpire held that (1) the grievants had not been in "continuous employment," since the mines were not in operation for a period of approximately eight years, and (2) the grievants had not been employed during this period by the same coal company. Both the requirement of continuous employment and employment with the same coal company, as opposed to employment at "the same mine," were considered essential by the umpire for qualification for graduated vacation pay and, based upon the absence of both conditions, he denied the grievance. Plaintiffs do not contest the decision of this umpire. Indeed, to some extent, they rely upon the findings of the umpire in attacking the decision of the umpire rendered in 1972.

Subsequent to the first umpire's decision in 1969, the International Union, United Mine Workers of America, and the Bituminous Coal Operators Association negotiated the National Bituminous Coal Wage Agreement of 1971 and by that agreement changed the provisions with regard to qualification for graduated vacation pay. Under the 1971 agree-

ment, the controlling provisions with respect to graduated vacation pay read as follows:

"Any employee who has performed work in the calendar year and who had the length of continuous employment with the employer specified in the table below, shall be entitled to the corresponding additional vacation days each year with pay subject to the following provisions of this article.

.     .     .     .     .     .

"(1) For the purposes of this article 'continuous employment' means employment which has not been broken by voluntarily quitting, discharge, retirement or a final determination of permanent and total disability under federal and/or state laws which provide compensation therefor.

"(2) Continuous employment is NOT interrupted or broken by layoff. Therefore, time spent on an idle panel is counted in determining length of continous employment .    .    . .

"(3) Continuous employment is NOT interrupted or broken by transfers from one mine of the Employer to another mine of the same Employer.

"(4) Continuous employment is NOT interrupted or broken by the sale, lease, sub-lease or assignment of any mine to which this agreement is applicable for employees who are continued in employment or re-employed from the idle panel by the successor company."

It was on the basis of the changes in the collective bargaining agreement with respect to entitlement to graduated vacation·pay, in particular the deletion of the requirement of employment with the same employer, that plaintiffs processed their grievence again through the various steps of the grievance procedure in 1972, including a reference to an umpire for decision.

The Court has carefully reviewed the decision of the second umpire rendered on March 27, 1972, and, on the basis of that review, is compelled to hold that the umpire's decision, in its controlling aspects, "drew its essence" from the collective bargaining agreement and his interpretation of the terms of that agreement. Indeed, the sole basis of the decision was the umpire's interpretation of the provisions in the collective bargaining agreement setting forth the conditions necessary to qualify for graduated vacation pay and, in particular, the meaning he attributed to the term "continuous employment." It is important to note that the umpire's decision was based upon alternate grounds, either of which would sustain his decision, i. e., (1) that the employees were not re-employed from the idle panels, and (2) that their employment had not been "continuous."

The Court is inclined to agree with plaintiffs' contention that the decision of the umpire in 1972 misinterpreted the umpire's 1969 decision insofar as the earlier decision was construed to hold that the plaintiffs had not been rehired from an idle panel. To the extent that the earlier decision discussed this question, it would appear that the umpire held that plaintiffs were, in fact, rehired from the idle panel when they started work for the defendant at the Shannon Branch Mine. Nevertheless, as both umpires found, plaintiffs' employment was not "continuous" with the employer or at the mine between 1960 and 1968 and for that reason, regardless of whether or not they were rehired from an idle panel, plaintiffs did not qualify for graduated vacation pay based upon a period of time prior to their employment by defendant.

The collective bargaining agreement, in setting forth conditions with respect to entitlement to graduated vacation pay speaks of "continuous employment." It then sets forth certain events which are not to be held to interrupt such continuous employment, such conditions including layoffs, sale, lease, sub-lease, or assignment of the mine, or transfer from one mine to another. However, as noted by the umpire in the 1972 decision, before the question of whether or not the

specified events interrupt continuous employment is determined, it must first be decided whether, in fact, there has been continuous employment of the miners. Both umpires ultimately found that the employment of the miners had not been interrupted by any of the conditions specified in the respective agreements as *not* interrupting otherwise continuous employment, but that the miners' employment had been terminated by the closing of the Capels and Havaco Mines in 1960 by the New River and Pocahontas Consolidated Coal Company, and, for that reason, was not "continuous employment." Employment which has not been "continuous" does not become so by reason of the occurrence of a condition, or conditions, which otherwise, under the provisions of the contract, would not interrupt continuous employment. This is the essence of the decision of the umpire rendered in 1972 and, upon analysis of the facts and the collective bargaining agreement governing the rights of the plaintiffs, the Court cannot say that that decision lacks a rational basis in the collective bargaining agreement. And since the agreement on its face makes the question of entitlement to graduated vacation pay arbitrable thereunder and since the parties have already availed themselves of this contractual prerogative in an attempt to resolve the dispute and have submitted the issue to arbitration under the machinery and procedures set up for such purpose in the agreement, the decision of their umpire therein rendered in pursuance thereof, absent such factors as fraud, deceit or breach of the union's duty of fair representation, may not be successfully attacked in this court, and this is nonetheless so even if this court should disagree with the umpire's interpretation or construction of the agreement. Therefore, inasmuch as the plaintiffs do not attack the umpire's decision on the basis of fraud, deceit or breach of the union's duty of fair representation, and since we find his decision does have support in the language of the collective bargaining agreement, we conceive it to be our plain duty, under such circumstances and the statutory and decisional law hereinbefore referred to, to decline to reverse, vacate or otherwise disturb the umpire's decision under attack herein. As a consequence, there being no issue of material fact involved, the Court will grant defendant's motion for summary judgment, for the reasons stated in this opinion, and deny plaintiffs' like motion.

An appropriate order will issue accordingly.